UNITED STATES v. HUGHES.

(District Court, D. South Carolina. January 23, 1896.)

PROVIDING MEANS FOR MILITARY EXPEDITION — WHAT CONSTITUTES OFFENSE.
Whether the master of a vessel, which took on board, from a tug off the coast of New Jersey, 30 or 35 men, and at the same time boxes of arms and ammunition, and then set sail for Cuba, provided or prepared the means for a military expedition or enterprise, within Gen. St. § 5286, declaring guilty of a misdemeanor "every person who, within the territory or jurisdiction of the United States, begins, or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against * * * any foreign * * * state * * * with whom the United States are at peace," depends on whether they (not being a military organization when they came aboard) were, with the knowledge of the master, after coming on board, armed, and given military drill and instruction, and put into a state of efficiency for warlike operations.

Prosecution of Samuel Hughes for violation of Rev. St. U. S. § 5286.

Wm. Perry Murphy, U. S. Dist. Atty., E. W. Hughes, Asst. U. S. Dist. Atty., and Jos. W. Barnwell, Special Asst. U. S. Atty., for the United States.

J. P. K. Bryan and M. C. Butler, for defendants.

Malet Prevost and Henry Buist, for Spanish consul.

BRAWLEY, District Judge (charging jury). The defendant is indicted under section 5286 of the General Statutes, which is in these words:

"Every person who, within the territory or jurisdiction of the United States, begins, or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding three thousand dollars, and imprisoned not more than three years."

There is no inhibition under this statute against the shipment of arms or other munitions of war, nor are individuals forbidden to leave this country in unarmed association, for the purpose of joining in any military operations in a foreign country. Persons who go upon such expeditions incur the risk of capture when they come within the jurisdiction of such foreign power, and arms and munitions so shipped may likewise be seized. Whether our statutes on this subject provide with sufficient efficacy for the prevention of any acts which might tend to the violation of the obligation of neutrality is not a question for your consideration or my opinion. Under this indictment your duties are limited to the determination of the single question as to whether the defendant has violated the section as charged. As there is no evidence tending to show that the defendant began or set on foot or was the leader of any expedition, your inquiry is confined to a consideration of the other offense denounced and described in this section, to wit, the preparing or providing the means for any military expedition or enterprise. Now, as it has been conclusively proved, and is not denied, that a number of men were carried by the defendant on board of his ship, that the means for the transportation of the same were prepared and provided by him, your inquiry is still further narrowed, and the simple question left for your determination is whether this was a military expedition or enterprise. There is no precise definition given by any recognized authority of what constitutes a military expedition or enterprise. There would be no question that a military company organized as infantry, artillery, or cavalry, with officers, arms, and equipments, would constitute such a military force that the transportation of it from within our territory or jurisdiction would come within the prohibitions of this statute; the uncombined elements of such a force—that is to say, individuals not drilled or organized or capable of being put into a state of efficiency for warlike operations—would not constitute a military expedition within the meaning of this statute, and the transportation of such individuals as passengers would be legitimate commerce, such as our laws permit. It is for you to decide whether

this body of men fall within the first or the second class. If the lines which distinguish between the two were clearly marked, there would be no difficulty, and nothing to submit to you,—the court would instruct you. It is because there is a wide border land between the two, not precisely delimited, that a question arises for your solution; and to solve it rightly you must consider carefully all the testimony that you have heard, and I will now state to you so much of the evidence as may help you to a right conclusion. It is for you to determine the credibility of the witnesses. The duty of the court is to determine, and it has determined, their competency. You can believe all, or a part, or none of these witnesses. Now, proof has been offered to show: That on the morning of the 21st October, just off the Jersey coast, the steamship Laurada took aboard certain men—30 or 35 men—from a tug which met her at that point. That she also took aboard at the same time certain boxes and arms and ammunition. Whether those men were armed when they came aboard is a question for your determination. Some of the witnesses say they were, and some say they were not; some say that some were armed, and others not; some of them say all the men had machetes, which are described as long knives; some of the witnesses have called them swords. That after taking aboard these men the steamship set sail for the coast of Cuba. The route by which the Laurada would go in making her voyage to Jamaica is naturally and necessarily one which would carry her by the coast of Cuba. What those men did aboard ship after they got aboard is a question which you will have to decide. If they came aboard and were received as ordinary passengers in unarmed association, and were carried simply as passengers, and neither before they came aboard nor after they came aboard were they organized as a military company, then, under the law as given to you, the transportation of those men would not be an offense under this statute. But if, after they came aboard, they took the arms from the boxes, and organized themselves into a company or organization; if they were drilled or went through the manual of arms under the leadership or direction of one man or more; if they then became a military organization by reason of such coming together and of such drill or instruction,—then from that time forth they would be a military organization or enterprise within the meaning of this statute. It is for you to say whether they did go through that process of organization. There is no proof that before they came aboard they had been so organized, and in the absence of that proof you would not be warranted in assuming that they came aboard as a military organization, or that they were received as such; but if, after they came aboard, within the knowledge of the captain, who was the master of the ship, and could control everything that went on on board that ship, they were organized and drilled; if they took the arms from the boxes for the purpose of such organization and drill, and were themselves put into a state of efficiency for warlike operations,—then the enterprise would take on the character of a military expedition, within the meaning of this statute, and it is for you to determine from the testimony

in the case whether that is so or not. Some of the witnesses testify to a constant drilling; some of them testify to occasional drilling; some of them testify to their seeing no drilling at all; some of them say that this drilling, or the exercise of the manual of arms, took place at such a point on the ship that any one passing that way by the hatch could see them; other witnesses testify they passed by the hatch frequently, and saw nothing of that kind going on. The court cannot help you to a conclusion on that point. It is entirely for you to say whether or not that thing went on. If you believe from all the circumstances attendant upon the embarkation of these men that they had before that time been organized into a military force, or if you believe that without any previous organization or drilling they came aboard in a body for the purpose of forming, while aboard the ship, a military organization, and that they brought with them such arms and munitions of war as would enable them to organize themselves, and to create on board of that ship, and therefore within the jurisdiction of the United States, a military expedition or enterprise; and if you believe that while aboard the ship they became organized and were drilled or instructed in the manual of arms, and were thus made capable of efficient proximate combination into a force prepared for immediate military operations; and if you believe that such a preparation for a military expedition was within the knowledge of the defendant, and that, being the master of his ship, he permitted it to be used for such purpose, and that thereafter he transported such a body, providing for the maintenance and comfort of the organization thus formed, and aided in the landing of it near the scene where military operations were to be carried on,—then he must be considered as guilty of violating the law under which he is indicted. If, however, you believe that the defendant, as master of a merchant ship engaged in legitimate commerce, carried passengers to the Island of Cuba, simply as ordinary passengers, and that boxes of arms and ammunition were carried simply as merchandise, then he would be within his right, for under our law it is not forbidden to transport either men or munitions of war. And, inasmuch as the government had the right to seize such men and munitions upon their coming within its jurisdiction, which covers the waters within three miles of the coast of Cuba, the secrecy attending the landing would not of itself constitute an offense.

I must remind you, gentlemen, that you are trying this defendant for violating the laws of the United States; that this prosecution is not in the interest of Spain, or instituted in furtherance of her plans for the repression of insurrection against her government. The prosecution is conducted by the officers of your government, and in vindication of your laws, and you are bound by the regard which you have for your country, and the reverence you have for its laws, to consider the case divested of any feeling of prejudice or sympathy. If the government of the United States and our people desire to aid in the political regeneration of oppressed nations there are methods by which that end can be accomplished, but all those considerations lie outside the domain which circumscribes our du-

ties here to-day. In so far as the government of Spain has brought to the attention of our government this alleged violation of our laws, and has offered witnesses to prove the same, and has provided for the maintenance of the witnesses pending the time when their testimony could be properly presented, she has been entirely within her right, and the conduct of her officials in that regard is not a subject of just animadversion. When you come to the consideration of the testimony of such witnesses, you will naturally and properly consider the fact—which is not denied—that the witnesses have been receiving pay from the Spanish government, as affecting their credibility, just as it is in all cases the duty of the jury to consider everything in the way of motive, interest, or inducement which tends to throw light upon such testimony, as to whether they are probably telling the truth or otherwise. You will give the defendant the benefit of any reasonable doubt. That doubt must not arise from desire, but must grow out of the testimony. It must not rest upon sympathy or wish to relieve him from the consequences of his act if you believe him to be really guilty. Your verdict may be either, "Not guilty," or "Guilty," or "Guilty, with a recommendation to mercy."